(C. D. 1947)

BRAMMER VEE LINK BELTING, INC. *v.* UNITED STATES

United States Customs Court, Second Division

(Decided December 24, 1957)

*Tompkins & Tompkins* (*Allerton deC. Tompkins* of counsel) for the plaintiff.
*George Cochran Doub,* Assistant Attorney General (*Henry J. O'Neill,* trial attorney), for the defendant.

Before LAWRENCE, RAO, and FORD, Judges

LAWRENCE, Judge: The question for our determination here is whether certain imported rivets had been "lathed, machined, or brightened" prior to their arrival in this country.

The collector of customs decided that the rivets had been so treated and classified them accordingly in paragraph 332 of the Tariff Act of 1930 (19 U. S. C. § 1001, par. 332), as modified by the General Agreement on Tariffs and Trade, 82 Treas. Dec. 305, T. D. 51802, and imposed duty thereon at the rate of 15 per centum ad valorem.

(1)

Plaintiff claims that the rivets had not been subjected to any of the processes above mentioned and that they should be classified in said paragraph 332, similarly modified, as rivets of steel, not specially provided for, and subjected to duty at the rate of one-half of 1 cent per pound.

The text of paragraph 332, as modified, *supra*, is here set forth, the pertinent parts being stressed:

*Rivets*, studs, and steel points, *lathed, machined, or brightened,* and rivets or studs for nonskidding automobile tires_____ 15% ad val.
*Rivets of iron or steel, not specially provided for*_____ ½¢ per lb.

At the trial, the following exhibits were introduced in evidence by plaintiff:

Collective exhibit 1—Three rivets representing items of merchandise identified on the consular invoice as sizes "A," "B," and "C," "A" being the smallest size, "B" the medium, and "C" the largest size.

Collective illustrative exhibit 2—Two samples of Brammer Vee Link belting manufactured by plaintiff company to illustrate the use of merchandise like exhibit 1.

Collective illustrative exhibit 3—Three samples of wire from which rivets like exhibit 1 are fabricated.

Collective illustrative exhibit 4—Three samples of material, such as exhibit 3, that have been punched with the first heading machine to form the head of the samples.

Collective illustrative exhibit 5—Three samples of material like exhibit 4 after a shoulder has been formed on each and prior to their having been put in an acid dye bath.

Exhibit 6—A sheet of paper upon which is illustrated a cold-forged rivet and a machined rivet.

It was agreed by the parties that the rivets in controversy were composed of steel.

Two witnesses were called, both of whom testified on behalf of plaintiff.

Ronald Horley, employed as engineer and manager for Brammer Vee Link Belting, Inc., plaintiff herein, in New York and in England covering a period of 4 years, stated that he was familiar with the installation and use of machines, punches, and dies used in the manufacture of the rivets in controversy. He testified that the rivets were cold-forged from wire stock, using dies and punches of a predetermined size. He added:

* * * The wire stock is fed continuously into the front of the cold forging machine; once there, a knife slices off a piece of metal which is centered by a carrier finger in front of the punch; at that stage the punch closes upon the slug of metal and with one blow squeezes sufficient metal to form an oval head complete with identifying letter into the cavity of the die; this operation is performed two hundred forty times per minute; from that machine the headed rivets are

placed into an automatic hopper feed of the re-heading machine where they are picked out with carrier fingers and placed between a pair of split dies which grip the head and shank of the rivet which leaves sufficient shank protruding to allow for the shoulder. The re-heading die closes in and also in one blow squeezes sufficient metal to form the shoulder into the cavity of the second die at the same time reducing the overall length of the rivets to its correct measurement. From this machine the rivets are removed to a sawdust bath where all excess oil is removed and from there to an acid dye bath which gives them a rust-proof coating.

Horley testified that the rivets in controversy were produced by a cold-forging operation, in which process "there is no waste metal removed from the piece of metal and if you start out with one ounce of wire stock, you wind up with one ounce of wire stock, nothing removed at all. The shape is changed by the equipment, but the volume of metal remains exactly the same." On the other hand, it was explained by the witness, if the rivets were made on a lathe, "one would have to have a piece of bar stock equal to or greater than the largest diameter of the rivet head; to produce the shank and shoulder, the material would have to be cut away down to the dimensions required so that with a rivet of that type, you would have at least sixty percent waste material removed from this original bar stock," the witness referring to exhibit 6 to illustrate the difference between a forged rivet and a lathed or machined rivet.

Based upon his personal experience with the maufacture of rivets, either machined or forged, Horley was positive in the statement that the rivets under consideration were not lathed or otherwise machine tooled, and neither were they brightened, a term which denotes anything that has been polished, buffed, or chrome plated; that the subject rivets "are merely dyed, which is merely an anti-rust procedure, a de-oxidization process," and that, as a matter of fact, the samples in exhibit 1 were actually duller than the raw stock from which they were made.

On cross-examination, Horley explained the dyeing process to which the rivets were subjected as follows:

The rivets when finished are placed in a large iron vat which is under heat and proportions of dye, acid, ammonia, water are added and the rivets are boiled for one hour and taken out and drained off; that constitutes the whole operation of dyeing the rivets.

This process, the witness asserted, did not result in a brightening of the rivets.

The record also shows that, after the rivets are given the dye bath, they are placed in a sawdust bath to absorb any excess oil which may be present on the rivets.

Louis A. Cummaro was plaintiff's second witness, a mechanical engineer with 17 years' experience, having specialized in the field of mechanical fasteners, such as nuts, bolts, rivets, and the like. He was also a cofounder of the National Aircraft Standards Committee, which is an authority on standards of use in the aircraft field. As a

consultant, he assisted in ironing out problems with the manufacturers of screws, threaded products, rivets, nuts, and bolts, and, in 1937, established the rivet used at the present time in the aircraft industry. He described a machined rivet as one produced by means of cutting tools, in which there is a cutting away of the structure of the material.

He testified to the marked distinction between a cold-forged rivet and a machined rivet, the former being, as the term indicates, forged in a cold state, the other in which the material, by cutting, changes the integral structure of the material being worked upon. As stated by the witness:

* * * in cold forging you are remoulding as you would do in clay, you have reformed it, cold forging means we have not reheated the material, cold forging is simply a condition of moulding in a cold state.

Cummaro was positive in his opinion that the imported rivets in question were cold-forged; that they were neither machined nor lathed. He was equally certain that the rivets in controversy had not been brightened; that the action of the acid dye bath was simply as a rust preventative.

Defendant cites the following two definitions of the verb "machine," from which it concludes that the rivets in controversy have been machined within the meaning of paragraph 332—

Webster's New International Dictionary, 1929:

*Machine*, v. t. Machined; machining. 2. To subject to the action of machinery; to plane, shape, turn, mill or otherwise reduce, as a casting, to specified shape and dimensions by a machine or machines * * *; to effect by aid of machinery; * * *.

Funk & Wagnalls New Standard Dictionary (1956):

*Machine*, v. [machined; machining] 1. To work with a machine; subject to the action of a machine; effect by machinery.

The evidence establishes without contradiction that the rivets in controversy are cold-forged and not machined, which latter term implies the use of a lathe or cutting tool of some kind, whereas the cold-forging process is an act of extrusion, molding, or die shaping.

We are of the opinion that the rivets in controversy are not, in view of the testimonial record, machined within the dictionary definitions above quoted. Inasmuch as said rivets are cold-forged with the use of punches and dies, that process does not, as we view it, amount to a process of machining.

The evidence is also undisputed that the subject rivets have not been brightened, the dye bath to which they were subjected being merely for rust prevention, and the subsequent sawdust bath being solely for the purpose of absorbing any excess oil which may have been used in the forging process.

Based upon the record before us, we find and hold that the rivets here under consideration have not been lathed, machined, or bright-

ened within the meaning of paragraph 332, as modified, *supra*, and are properly dutiable at the rate of one-half of 1 cent per pound as rivets of steel, not specially provided for, as claimed by the importer.

The protest is sustained to the extent indicated and judgment will issue accordingly.